*United States ex rel. Chiles v. Cooke Inc.*

# United States Court of Appeals
# for the Second Circuit

August Term 2025
Argued: September 24, 2025
Decided: August 5, 2026
No. 25-155

UNITED STATES EX REL. W. BENSON CHILES,
UNITED STATES EX REL. CHRIS MANTHEY,

*Plaintiffs-Appellants*,

ABC, UNITED STATES OF AMERICA, EX REL.,

*Plaintiffs*,

*v.*

COOKE INC., COOKE AQUACULTURE INC., COOKE OMEGA
INVESTMENTS INC., COOKE SEAFOOD USA INC., OMEGA
PROTEIN CORPORATION, OMEGA PROTEIN, INC., GLENN
COOKE, BRET D. SCHOLTES, BMO CAPITAL MARKETS CORP.,
ALPHA VESSELCO HOLDINGS, INC., also known as OCEAN
FLEET SERVICES, INC., ALPHA VESSELCO LLC., doing busi-
ness as OCEAN HARVESTERS, SETH GREGORY DUNLOP,
GREGORY LAWSON DUNLOP, MONTGOMERY DEIHL,

*Defendants-Appellees,*

DEF,

*Defendant.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 21-CV-5743, Jesse M. Furman, *Judge*.

---

Before:     WESLEY, BIANCO, and ROBINSON, *Circuit Judges*.

Plaintiffs-Appellants W. Benson Chiles and Chris Manthey filed this *qui tam* action, as relators on behalf of the United States ("Relators"), against Defendants-Appellees Cooke Inc. ("Cooke"), Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA Inc., Omega Protein Corporation ("Omega"), Omega Protein, Inc., Glenn Cooke, Bret D. Scholtes, BMO Capital Markets Corp., Alpha VesselCo Holdings, Inc., a/k/a Ocean Fleet Services, Inc., Alpha VesselCo LLC., d/b/a Ocean Harvesters, Seth Gregory Dunlop, Gregory Lawson Dunlop, and Montgomery Deihl, alleging that Defendants defrauded the United States when they applied for and secured fishing endorsements. In their amended complaint, Relators assert that this alleged fraudulent scheme violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), by misrepresenting to the Maritime Administration ("MARAD") the citizenship of the entity that applied for fishing endorsements, thereby inducing the issuance of fishing endorsements to an ineligible non-U.S. entity and permitting that entity to fish for menhaden, a commercially valuable fish, in United States waters.

On January 3, 2025, the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*) dismissed the amended complaint, concluding that Relators could not establish that Defendants made a claim for property as required under 31 U.S.C. § 3729(a)(1)(A), (B), (C), or that Defendants avoided or decreased any established obligation to pay money to the United States, as required for a "reverse false claim" under 31 U.S.C. § 3729(a)(1)(G).  The district court also denied Relators' request for leave to file a further amended complaint.  On appeal, Relators argue that:  (1) wild fish in public waters are property under the FCA; (2) unassessed civil penalties allegedly incurred by the Defendants, for violations of the American Fisheries Act of 1998 ("AFA"), can support a reverse false claim; and, alternatively, (3) the district court abused its discretion in denying leave to add a cause of action under the FCA.

We agree with the district court and hold that wild fish are not "property" under the FCA, foreclosing the amended complaint's first three causes of action, and that the amended complaint fails to state a reverse false claim because unassessed civil penalties for alleged violations of the AFA do not constitute an "obligation to pay" under the FCA.  We also conclude that the district court did not abuse its discretion in denying leave to file a second amended complaint.

Accordingly, we **AFFIRM** the judgment of the district court.

> BRENDON DEMAY (Jack L. Millman, Brian T. Goldman, and Daniel Fahrenthold, *on the brief*), Holwell Shuster & Goldberg LLP, New York, New York, *for Plaintiffs-Appellants*.
>
> Courtney Saleski and Jessica A. Masella, DLA Piper LLP, New York, New York, *for*

*Defendant-Appellee BMO Capital Markets Corp.*

JONATHAN Y. ELLIS (David J. Pivnick, Michael J. Podberesky, and Grace Greene Simmons, *on the brief*), McGuireWoods LLP, Raleigh, North Carolina, Chicago, Illinois, and Washington, District of Columbia, *for Defendants-Appellees Cooke Inc., Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA Inc., Omega Protein Corporation, Omega Protein, Inc., Glenn Cooke*, and *Bret D. Scholtes*.

Robert Silverblatt and Andrew McCanse Wright, K&L Gates LLP, Washington, District of Columbia, *for Defendants-Appellees Alpha VesselCo LLC, Alpha VesselCo Holdings, Inc., Seth Gregory Dunlop, Gregory Lawson Dunlop*, and *Montgomery Deihl*.

Andrew B. Breidenbach, Theodora Oringher PC, Los Angeles, California, *for Amici Curiae Natural Resources Law and Property Law Professors*.

---

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs-Appellants W. Benson Chiles and Chris Manthey filed this *qui tam* action, as relators on behalf of the United States ("Relators"), against Defendants-Appellees Cooke Inc. ("Cooke"), Cooke Aquaculture Inc., Cooke Omega Investments Inc., Cooke Seafood USA Inc., Omega Protein Corporation ("Omega"), Omega Protein, Inc., Glenn Cooke, Bret D. Scholtes,

4

BMO Capital Markets Corp., Alpha VesselCo Holdings, Inc., a/k/a Ocean Fleet Services, Inc., Alpha VesselCo LLC., d/b/a Ocean Harvesters, Seth Gregory Dunlop, Gregory Lawson Dunlop, and Montgomery Deihl, alleging that Defendants defrauded the United States when they applied for and secured fishing endorsements. In their amended complaint, Relators assert that this alleged fraudulent scheme violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), by misrepresenting to the Maritime Administration ("MARAD") the citizenship of the entity that applied for fishing endorsements, thereby inducing the issuance of fishing endorsements to an ineligible non-U.S. entity and permitting that entity to fish for menhaden, a commercially valuable fish, in United States waters.

On January 3, 2025, the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*) dismissed the amended complaint, concluding that Relators could not establish that Defendants made a claim for property as required under 31 U.S.C. § 3729(a)(1)(A), (B), (C), or that Defendants avoided or decreased any established obligation to pay money to the United States, as required for a "reverse false claim" under 31 U.S.C. § 3729(a)(1)(G). The district court also denied Relators' request for leave to file a further amended complaint. On appeal, Relators argue that: (1) wild fish in public waters are property under the FCA; (2) unassessed civil penalties allegedly incurred by the Defendants, for violations of the American Fisheries Act of 1998 ("AFA"), can support a reverse false claim; and, alternatively, (3) the district court abused its discretion in denying leave to add a cause of action under the FCA.

We agree with the district court and hold that wild fish are not "property" under the FCA, foreclosing the amended complaint's first three causes of action, and that the amended complaint fails to state a reverse false claim because unassessed civil penalties

5

for alleged violations of the AFA do not constitute an "obligation to pay" under the FCA.[1] We also conclude that the district court did not abuse its discretion in denying leave to file a second amended complaint.

Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND[2]

The AFA requires that vessels 100 feet or greater in registered length hold a "fishery endorsement" to "engage in the fisheries." 46 U.S.C. § 12113(a), (b)(1). "A vessel owned by an entity is eligible for a fishery endorsement only if at least 75 percent of the interest in the entity, at each tier of ownership and in the aggregate, is owned and controlled by citizens of the United States" (the "citizenship requirement"). *Id.* § 12113(c)(1). Vessel owners must "file a statement of citizenship setting forth all relevant facts regarding vessel ownership and control with [MARAD] on an annual basis to demonstrate compliance." *Id.* § 12113(e)(1); *see also* 46 C.F.R. § 356.5(d) (providing the form affidavit that entities use to affirm their citizenship and their vessel's eligibility for a fishing endorsement). If MARAD determines that a vessel owner meets the citizenship requirement, it produces a determination letter that is filed with the U.S. Coast Guard, which, in turn, issues the fishery endorsement. Failure to comply with, or violation of, the citizenship requirement results in revocation of the fishery endorsement, 46 U.S.C. § 12113(h), and liability for a civil penalty that accrues for each day of a continuing violation, *id.* § 12151(a)(1). In addition, if a vessel owner "knowingly falsified or concealed a

---

[1] Because we affirm the district court's dismissal of the claims on these grounds, we need not address Defendants' alternative arguments for affirmance.

[2] The following facts are taken from Relators' amended complaint.

6

material fact, or knowingly made a false statement or representation, about the eligibility of the vessel under [the citizenship requirement]," the owner is liable for a civil penalty of up to $100,000 for each day the vessel engages in fishing. *Id.* § 12151(c).

The fishing of menhaden, a commercially valuable fish that is processed for use in fish oil supplements, animal feed, and bait, is the second largest fishery by tonnage in the United States. Prior to 2017, Omega was a publicly traded U.S. company and the "dominant player" in U.S. menhaden fishing, with a fleet that included 37 vessels over 100 feet in registered length. App'x at 79. In April 2017, Cooke, a private Canadian conglomerate, approached Omega with an acquisition offer. The amended complaint alleges that, upon realizing during the negotiations that a straightforward acquisition of Omega would render its vessels ineligible to receive a fishery endorsement, Defendants structured the transaction to give "the illusion of independent ownership, while ensuring that Cooke and Omega would retain total control via a figurehead" and to conceal Defendants' noncompliance with the citizenship requirement. *Id.* at 101. More specifically, the amended complaint alleges that Omega's vessels were transferred to a new Omega subsidiary, which was then sold to a holding company that was 20% owned by Omega and 80% owned by a U.S. citizen and Cooke employee, Seth Dunlop, whose uncle is Cooke's Chief Executive Officer, Glenn Cooke. The amended complaint further alleges that Defendants "defrauded the [g]overnment by falsely certifying that they complied with the [citizenship requirement] and by concealing from MARAD numerous facts that were material to MARAD's citizenship determinations under the [AFA]." *Id.* at 113. Finally, the amended complaint alleges that Defendants' knowing violation of the citizenship requirement and fraudulent procurement of fishery endorsements has defrauded the United States

7

government and resulted in the harvesting of "millions of dollars' worth of [menhaden]." *Id.* at 82.

Relators initiated this *qui tam* action in July 2021. In March 2024, the government declined to intervene. In their amended complaint, Plaintiffs assert four causes of action under the FCA, alleging that: (1) Defendants presented false or fraudulent claims, 31 U.S.C. § 3729(a)(1)(A); (2) Defendants knowingly made, or caused to be made, a false statement material to a false claim, *id.* § 3729(a)(1)(B); (3) Defendants conspired to submit, or caused to be submitted, a false claim, *id.* § 3729(a)(1)(C); and (4) Defendants knowingly made a false statement material to an obligation to pay the government, or a "reverse false claim," *id.* § 3729(a)(1)(G).

Defendants moved to dismiss the amended complaint and the district court granted the motion. *See generally United States v. Cooke Inc.*, No. 21-CV-5743 (JMF), 2025 WL 27662 (S.D.N.Y. Jan. 3, 2025). As an initial matter, the district court noted that Relators' first three causes of action "all require a showing that Defendants made a request for 'money or property' within the meaning of the [FCA]." *Id.* at *3. The district court then held that those three causes of action failed because "neither the fishery endorsements Defendants obtained for their fishing vessels nor the menhaden fish Defendants were able to harvest from U.S. waters are 'property' within the meaning of the FCA." *Id.* at *7. Finally, the district court concluded that Plaintiffs' fourth cause of action, the reverse false claim, failed because the underlying statutory penalties are discretionary, as opposed to mandatory. *See id.* at *7–9. The district court also denied Relators' request for leave to amend to add a new cause of action under the FCA. *See id.* at *9.

This appeal followed.

## DISCUSSION

"We review *de novo* a district court's dismissal for failure to

8

state a claim under Federal Rule of Civil Procedure 12(b)(6), accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (internal quotation marks and citation omitted). Similarly, we review *de novo* the district court's statutory interpretation that underlies its order of dismissal. *See Romea v. Heiberger & Assocs.*, 163 F.3d 111, 114 (2d Cir. 1998). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"The FCA imposes significant penalties on those who defraud the [g]overnment." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 541 (2d Cir. 2024) (internal quotation marks and citation omitted). "The FCA, however, is 'not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations.'" *United States ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 803 (2d Cir. 2025) (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016)). As relevant here, the statute imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). To establish a claim under either subsection, a relator must show that the defendant: "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes v. Straus*, 274 F.3d 687, 695 (2d

9

Cir. 2001), *abrogated on other grounds by Universal Health Servs.*, 579 U.S. 176.  The term "claim" is defined by statute as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2)(A)(i).  The FCA's reverse false claim provision imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the [g]overnment."  *Id.* § 3729(a)(1)(G).  The statute also imposes liability where a defendant "conspires to commit" a violation of these provisions.  *Id.* § 3729(a)(1)(C).

Relators assert that the district court erred in dismissing their property-based claims under Section 3729(a)(1)(A)–(C), as well as the reverse false claim under Section 3729(a)(1)(G).  Alternatively, Relators contend that the district court abused its discretion in denying the request for leave to amend.  We address each argument in turn.

## I.    Property-Based Claims Under the FCA

A false claim under the FCA "normally connotes a demand for money or for some transfer of public property."  *United States v. McNinch*, 356 U.S. 595, 599 (1958) (internal quotation marks and citation omitted).  Here, the amended complaint alleges that the property at issue is wild fish.  *See* App'x at 78 ("As a result of their fraudulent scheme, Defendants have illegally harvested from United States waters many millions of dollars' worth of fish to which they are not entitled.").  On appeal, Relators argue that the district court erred in dismissing their property-based claims under the FCA on the ground that the wild fish at issue are not

"property" under the statute.[3]  Assuming without deciding that the defendants' application for a fishing endorsement is tantamount to a claim for the fish they would catch pursuant to that license, we disagree that the wild fish are "property" under the statute.

Because the FCA does not define property, we look to "traditional concepts of property" law to determine whether an interest is sufficient to constitute property under the FCA.  *Cleveland v. United States*, 531 U.S. 12, 24 (2000); *see also United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994) ("[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right.").  As set forth below, the district court correctly determined, based upon well-settled Supreme Court precedent, that free-swimming wild fish and game are not the property of the state or federal government under traditional concepts of property law and, thus, wild fish cannot constitute "property" for purposes of an FCA claim.

As Relators note, in the late nineteenth century, the Supreme Court did suggest that a state has ownership in wildlife.  In particular, in *Geer v. Connecticut*, 161 U.S. 519 (1896), the Supreme Court surveyed the history of property rights in wildlife, from the Institutes of Justinian to Blackstone, and concluded that wild fish and game within a state's territory are the common property of its citizens and that the state acts as a trustee for that common property.  *Id.* at 529 ("While the fundamental principles upon which the common property in game rest have undergone no change, the development of free institutions had led to the

---

[3]  Relators do not challenge on appeal the district court's separate determination that the fishery endorsements also do not qualify as property under the FCA.

recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good.").

In dissent, Justice Field agreed that the state had authority to regulate wild fish and game. *See id.* at 541 ("I do not doubt the right of the state, by its legislation, to provide for the protection of wild game, so far as such protection is necessary for their preservation, or for the comfort, health, or security of its citizens, and does not contravene the power of congress in the regulation of interstate commerce."). But he did not ground that authority in state *ownership* of wild fish and game; rather, he concluded that nobody has a *proprietary* interest in wild fish and game until it is caught:

> I hold that where animals within a state, whether living in its waters or in the air above, are, at the time, beyond the reach or control of man, so that they cannot be subjected to his use or that of the state in any respect, they are not the property of the state or of any one in a proper sense. I hold that, until they are brought into subjection or use by the labor or skill of man, they are not the property of any one, and that they only become the property of man according to the extent to which they are subjected by his labor or skill to his use and benefit.

*Id.* at 539.

Within several decades, the Supreme Court began its retreat from the view that wild fish or game are the property of the state, as suggested in the majority holding in *Geer*, and moved towards Justice Field's dissent, which classified such fish and game as property of no one. For example, in *Missouri v. Holland*, 252 U.S. 416 (1920), the Supreme Court held that the 1916 treaty between

the United States and Great Britain, which regulated the killing and sale of migratory birds, was a proper exercise of the federal government's treaty power under the Constitution. *Id.* at 431–35. In doing so, the Supreme Court rejected Missouri's argument that the treaty was invalid because the state had ownership of such birds or possessed exclusive power to regulate their killing:

> No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away.

*Id.* at 434. Similarly, in *Toomer v. Witsell*, 334 U.S. 385 (1948), the Supreme Court again rejected the contention that a state owns the wild fish within its waters, explaining that "[t]he whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." *Id.* at 402.

The Supreme Court reiterated this legal principle again in *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977), which held that a Virginia statute that limited the ability of "nonresidents or aliens" to catch a certain fish, namely, menhaden, in its territorial waters was preempted by federal law. *Id.* at 286. In reaching that determination, the Court adopted the reasoning of Justice Field's dissent in *Geer*, explaining:

> A State does not stand in the same position as the owner of a private game preserve[,] and it is pure fantasy to talk of "owning" wild fish, birds, or animals. Neither the

> States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. . . . The "ownership" language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing "the importance to its people that a State have power to preserve and regulate the exploitation of an important resource."

*Id.* at 284 (citing *Holland*, 252 U.S. 416, and *Geer*, 161 U.S. at 539–40 (Field, J., dissenting), and quoting *Toomer*, 334 U.S. at 402); *accord Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 386 (1978).

Any conceivable doubt as to the continuing vitality of the "ownership" language of *Geer* was eliminated in *Hughes v. Oklahoma*, 441 U.S. 322 (1979), which noted that "[t]he *Geer* analysis has . . . been eroded to the point of virtual extinction in cases involving regulation of wild animals" and, after tracing that erosion, "expressly overrule[d] *Geer*." *Id.* at 331–35. In doing so, the Court relied upon the above-referenced quotation from *Douglas*, which it noted "explicitly embraced the analysis of the *Geer* dissenters."[4] *Id.* at 334.

---

[4] Although Relators seek to rely upon the Supreme Court's more recent decision in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), to support their position, such reliance is misplaced. In *Horne*, growers of raisins challenged a requirement by the federal government that they set aside a certain percentage of their yearly crop for a government reserve account, free of charge. *Id.* at 355. In an effort to combat the growers' argument that this reserve requirement constituted an unlawful taking under the Fifth Amendment, the government countered that the requirement was a permissible condition on raisin growing, rather than a taking, and relied upon *Leonard & Leonard v. Earle*, 279 U.S. 392 (1929), which upheld a Maryland law requiring oyster packers to obtain a license and return at least 10% of the used shells to the state. *Horne*, 576 U.S. at 365–67. In holding that the reserve requirement for raisins constituted an unlawful taking, *Horne* distinguished *Leonard* by explaining that privately

This Court has likewise recognized this well-settled principle of law regarding the lack of property rights in wildlife. More specifically, in *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978), we explained—citing, *inter alia*, *Douglas*, *Holland*, and Justice Field's dissent in *Geer*—that, "[a]s a general rule, wild fish, birds and animals are owned by no one" and "[p]roperty rights in them are obtained by reducing them to possession." *Id.* at 163–64. Other circuits have similarly acknowledged that the government's proprietary ownership of wildlife is a fiction. *See Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 870–71 (10th Cir. 2019); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 809 (Fed. Cir. 2006); *Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 671 (1st Cir. 1980); *Reeves, Inc. v. Kelley*, 603 F.2d 736, 737–38 (8th Cir. 1979).[5]

grown raisins were "the fruit of the growers' labor," while "the oysters, unlike raisins, were 'feræ naturæ' that belonged to the [s]tate under state law." *Id.* at 367. Although the Supreme Court did use the language of ownership to distinguish *Leonard*, we again view such language as a shorthand reference (as in earlier Supreme Court cases) to a state's power to regulate the taking and control of wild animals, rather than as establishing the existence of a property right. *See also id.* ("Raisins are not like oysters: they are private property—the fruit of the growers' labor—not public things subject to the absolute control of the state.") (internal quotation marks and citation omitted). We therefore reject Relators' suggestion that this language in *Horne* somehow implicitly overruled the Court's analysis regarding the lack of any ownership rights in wild fish or game, as repeatedly articulated in cases such as *Holland*, *Toomer*, *Baldwin*, *Douglas*, and *Hughes*.

[5]   In support of their position that *Geer* is still good law, Relators rely on the Tenth Circuit's decision in *Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir. 1986) (en banc). Although the *Hodel* court noted that it read *Hughes* as overruling only "the narrow holding of *Geer* by rejecting the view that a state, without violating the Commerce Clause of the Constitution, may prohibit the export of wildlife lawfully taken within the state," *id.* at 1426 n.5, it did not endorse the view that *Geer* supported the

Accordingly, based upon the Supreme Court's precedent regarding the lack of property rights in wild fish and game, which was confirmed by our decision in *Long Cove*, we hold that no one owns or has a property interest in wild fish within state or federal waters and, thus, the wild menhaden fish harvested in U.S. waters by Defendants are not "property" within the meaning of the FCA. In reaching this decision, we emphasize that, although federal and state governments do not have a proprietary interest in

existence of a property right in wildlife by the state. To be sure, it cited *Geer* for the proposition that "[i]t is well settled that wild animals are not the private property of those whose land they occupy, but are instead a sort of common property whose control and regulation are to be exercised 'as a trust for the benefit of the people.'" *Id.* at 1426 (quoting *Geer*, 161 U.S. at 528–29). However, the Tenth Circuit then emphasized:

> Neither state nor federal authority over wildlife is premised upon any technical "ownership" of wildlife by the government. Although older decisions sometimes referred to government "ownership" of wildlife, that language has been deemed "a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." [*Toomer*, 334 U.S. at 402]. As the Supreme Court declared, "[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government . . . has title to these creatures until they are reduced to possession by skillful capture." [*Douglas*, 431 U.S. at 284 (citing *Holland*, 252 U.S. at 434); *Geer*, 161 U.S. at 539–40 (Field, J., dissenting)].

*Id.* at 1426–27. Thus, *Hodel* provides no support for Relators' claim that a state has a property right in wildlife. Indeed, the Tenth Circuit again rejected that contention in *Utah Native Plant Society*, in which it quoted the above-referenced language from *Hodel* and held that, "[b]ecause wild animals are not the private property of those whose lands they occupy, the State of Utah, at least once it released the goats back into the wild, did not own the goats. . . ." 923 F.3d at 870–71.

16

wild fish and game, they retain broad powers to regulate the taking of such wild fish and game. Those regulatory powers have been long recognized by the Supreme Court, and our holding today does nothing to disturb those powers. *See, e.g.*, *Hughes*, 441 U.S. at 338 (stating that "[t]he overruling of *Geer* does not leave the States powerless to protect and conserve wild animal life within their borders"); *Toomer*, 334 U.S. at 402 (describing "[t]he whole ownership theory . . . as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource").

Instead, consistent with Supreme Court precedent, we conclude that this power to regulate wild fish and game is not based on ownership and does not create a property right in them and thus cannot be the subject of a cause of action for fraud in connection with a claim for property under the FCA. Although Relators attempt to distinguish this clear precedent on several grounds, we find each of those arguments unpersuasive and address each one in turn.

First, Relators argue that "the plain language of the Submerged Lands Act ["SLA"] confirms that States have 'title to and ownership of' 'fish' within State waters." Appellants' Br. at 15 (quoting 43 U.S.C. §§ 1311(a)(1), 1301(e)). The SLA, which was enacted in 1953, states:

> It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the

respective States.

43 U.S.C. § 1311(a). The statute defines "natural resources" to include, "without limiting the generality thereof, . . . fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life." *Id.* § 1301(e).

According to Relators, the SLA's first clause vests property rights in states over, *inter alia*, wild fish, whereas the second clause confirms the states' regulatory power over the same. We disagree. Relators' reliance on the SLA is misplaced. Although the Act confirms state title to submerged lands, its inclusion of fish within the definition of "natural resources" does not establish that states possess a *proprietary* interest in free-swimming wild fish.

The purpose of the SLA was to override the Supreme Court's decision in *United States v. California*, 332 U.S. 19 (1947). *See* H.R. REP. No. 82-695, at 5 (1951) ("Title II merely fixes as the law of the land that which, throughout our history prior to the Supreme Court decision in the California case in 1947, was generally believed and accepted to be the law of the land; namely that the respective States are the sovereign owners of the land beneath navigable waters within their boundaries and of the natural resources within such lands and waters."). In that decision, the Supreme Court had held that the federal government, and not the states, has the "paramount rights in and power over" the three-mile ocean belt contiguous to a state's shoreline. *California*, 332 U.S. at 38. Nothing in the SLA suggests that it was intended to override the principle that free swimming fish in the wild are not property.

Perhaps the best evidence that the SLA did not alter Supreme Court precedent as to free-swimming fish is that many of the cases determining that state ownership of wildlife is a "fiction"—

18

including *Douglas*, *Baldwin*, and *Hughes*—were decided *after* the SLA was enacted in 1953. *See Douglas*, 431 U.S. at 284; *Baldwin*, 436 U.S. at 386; *Hughes*, 441 U.S. at 334–35. Indeed, in *Douglas*, the Supreme Court had occasion to squarely address the argument that "the Submerged Lands Act . . . and a number of [the] Court's decisions recognize that the States have a title or ownership interest in the fish swimming in their territorial waters," and thus, "the States 'own' the fish." 431 U.S. at 283 (internal citation and footnote omitted). The Court was clear that "[this] contention is of no avail," reiterating that, as a matter of property right, "it is pure fantasy to talk of 'owning' wild fish, birds, or animals." *Id.* at 283–84. Although Relators contend that the rejection of the state-ownership theory in *Douglas* was limited to the Court's prior case authority and did not include the SLA, that narrow reading of its analysis is unwarranted as its discussion regarding ownership of wild animals was made in direct response to the contention that the SLA vested in states ownership of fish swimming in their territorial waters. *Id.*

This reading of the Court's opinion is confirmed by Justice Rehnquist's partial concurrence, which disagreed with certain reasoning in the majority opinion, but indicated his agreement with the majority opinion that "the States do not 'own' free-swimming creatures within their territorial limits in any conventional sense of that term." *Id.* at 287 (Rehnquist, J., concurring in part) (citation omitted). More specifically, he emphasized that the "convey[ance of] 'title' and 'ownership' to such land and resources" in Section 1311(a)(1) of the SLA "could not reasonably refer to free-swimming fish which are incapable of such ownership." *Id.* at 290.

In *Long Cove*, we reached the same conclusion in interpreting the analogous language contained in a New York statute that provided that the "State of New York owns all fish, game, wildlife,

shellfish, crustacea and protected insects in the state, except those legally acquired and held in private ownership." 582 F.2d at 164 (quoting N.Y. Env't Conserv. Law § 11-0105). The question presented was whether we should interpret this statute literally to mean that "New York has asserted a true ownership interest in wildlife"—we concluded, "We think not." *Id.* at 165. We further explained that we viewed the language of the New York statute not as a claim of "a right of possession of wildlife," but rather as a claim "solely 'for the purpose of regulating and controlling their use and disposition.'"[6] *Id.* (quoting N.Y. Env't Conserv. Law § 11-0105). Thus, our interpretation of this New York statute in *Long Cove* regarding the lack of a "true ownership" right in wildlife further supports our reading of the similar language contained in the SLA.

In short, we conclude that nothing in the SLA alters the Supreme Court's direction that nobody has a proprietary ownership interest in free-swimming fish or otherwise supports Relators' attempt to classify wild fish as property under the FCA.[7]

---

[6] To be sure, in *Long Cove*, we noted that, "[u]nlike most wild animals, . . . clams, mussels and other sedentary or burrowing mollusks do not roam to any significant degree," and, "[h]ence, they are deemed to be in the possession of the owner, if any, of the land in which they are found." 582 F.2d at 164. However, that conclusion regarding the sedentary wild clams at issue in *Long Cove* has no application to the wild fish at issue here.

[7] Relators' cursory reliance on the Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson-Stevens Act") is similarly unavailing. Congress enacted the Magnuson-Stevens Act in 1976 as part of "[a] national program for the conservation and management of the fishery resources of the United States." 16 U.S.C. § 1801(a)(6) (1976). The statute provides, in relevant part, that "the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish . . . within the exclusive

Second, Relators argue that the Supreme Court's holdings that a state has no property right in wildlife can be distinguished because in those cases the Court was narrowly deciding federalism questions regarding whether a state's claim of ownership in wildlife could immunize it from federal regulation. We disagree. Although federalism issues were raised in various Supreme Court cases addressing this ownership of wildlife issue, the Court's analysis has not been limited to assessing a state's claim of property right against the federal government. Instead, as we recognized in *Long Cove*, the Supreme Court has made clear for over one century that, "[a]s a general rule, wild fish, birds and animals are owned *by no one*." 582 F.2d at 163 (emphasis added); *see also Douglas*, 431 U.S. at 284 ("*Neither the States nor the Federal Government*, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture.") (emphasis added); *Hughes*, 441 U.S. at 334 (quoting *Douglas* with approval); *Holland*, 252 U.S. at 434 ("Wild birds are *not in the possession of anyone*; and possession is the beginning of ownership.") (emphasis added).

To the extent Relators also contend that we should disregard any of the above-referenced language from the Supreme Court cases as "obvious dicta," Appellants' Reply Br. at 2, we disagree. As a threshold matter, we are unpersuaded that the Supreme Court's analysis in each of these cases can be classified as dicta. Even in cases where federalism issues were being raised, the Supreme Court's determination that no one owns wildlife was necessary to support its holdings that a state could not claim such ownership and, thus, was not dicta. *See Seminole Tribe of Fla. v.*

economic zone." *Id.* § 1811(a). That statutory language confers no ownership or property rights in the wild fish but rather confers federal authority to manage and regulate the fish in federal waters.

*Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). In any event, it is well settled that "we are obligated to accord great deference to Supreme Court *dicta*, absent a change in the legal landscape." *United States v. Harris*, 838 F.3d 98, 107 (2d Cir. 2016) (internal quotation marks and citation omitted); *see also Clemente v. Lee*, 72 F.4th 466, 474 (2d Cir. 2023). Here, there has been no change to the legal landscape on this issue subsequent to these Supreme Court decisions and, therefore, we afford great deference to that analysis across numerous cases, even if it constitutes dicta.

Finally, we reject Relators' contention that "[t]he [g]overnment's [i]nterest, [e]ven if [l]less than [o]wnership, [i]s [s]till a [p]roperty [i]nterest" that implicates the FCA. Appellants' Br. at 42. In particular, Relators suggest that, because a state has the right to exclude, possess, and use with respect to fish in public waters, that "States' interest in fish . . . bears the hallmarks of all the sticks in the bundle of property rights." *Id.* at 45. The "bundle of sticks" metaphor is "[a] common idiom" used to describe property. *United States v. Craft*, 535 U.S. 274, 278 (2002). "But that metaphor—whatever its merits in other contexts—cannot compensate for the absence of an interest that itself has long been recognized as property." *Ciminelli v. United States*, 598 U.S. 306, 314 n.4 (2023) (internal quotation marks and citation omitted).

Here, the interest that the government retains in wild fish and game is exercised through its regulatory power, and not by virtue of the government's ownership of them, and that interest (though broad and important) does not transform the regulatory power into a property right. Relators cite no caselaw for the proposition that the FCA reaches claims for things in which the government retains some sort of bundle of interests or that are simply subject

22

to governmental regulation. *Cf. United States v. Evans*, 844 F.2d 36, 42 (2d Cir. 1988) ("A law prohibiting a particular use of a commodity that the government does not use or possess ordinarily does not create a property right. If it did, many government regulations would create property rights."). Thus, notwithstanding the government's broad regulatory authority over wild fish, the lack of any property interest by the government in the fish is fatal to any attempt to assert an FCA cause of action based on an alleged false claim submitted to the United States regarding those fish. Accordingly, because the federal and state governments do not have a property interest in wild fish, the district court correctly concluded that the amended complaint failed to state a claim under Sections 3729(a)(1)(A), (B), and (C) of the FCA.

## II.     Reverse FCA Claim

Relators also argue that the district court erred in dismissing their reverse false claim under the FCA. Here, the theory regarding the reverse false claim is that the false certifications submitted by Defendants to MARAD and the Coast Guard "covered up illegal fishing conducted the prior year" and, "[i]n doing so, Defendants 'conceal[ed]' or 'avoid[ed]' or 'decrease[d] an obligation' to pay mandatory statutory penalties under the AFA for their illegal fishing and fraudulent statements." Appellants' Br. at 45–46 (alterations in original). As set forth below, we agree with the district court's conclusion that the allegations in the amended complaint fail to state a reverse false claim.

The FCA imposes liability on any person who makes a "reverse false claim," which "covers claims of money owed to the government, rather than payments made by the government." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) (emphasis omitted); *see also* 31 U.S.C. § 3729(a)(1)(G), (b)(3). "Under any theory of a reverse false claim, . . . the relator must

23

allege an 'obligation' to pay money or property to the government." *Miller*, 110 F.4th at 542. An "obligation" is defined as "an established duty, whether or not fixed, arising from" enumerated sources, including a contractual relationship, statute, or regulation. 31 U.S.C. § 3729(b)(3). "[A] duty to pay is established only when it triggers an immediate and self-executing duty to pay." *Billington*, 126 F.4th at 804 (emphasis, internal quotation marks and citation omitted). "In other words, . . . potential or contingent exposure to penalties does not create an 'established' duty to pay and, accordingly, an obligation does not exist by the mere fact of a violation." *Miller*, 110 F.4th at 545.

The district court held that, because the AFA's civil penalties are discretionary, Relators failed to state a reverse false claim. *Cooke*, 2025 WL 27662, at *7–9. On appeal, Relators assert that the AFA's civil penalties for violating the citizenship requirement are mandatory. In particular, Relators point to two statutory provisions: the first provides that "a person that violates [a provision of the AFA or a regulation promulgated thereunder] *is liable* to the United States [g]overnment for a civil penalty," 46 U.S.C. § 12151(a)(1) (emphasis added); and the second provides that "the owner of a documented vessel for which a fishery endorsement has been issued *is liable* to the [g]overnment for a civil penalty . . . if [they or their agent] knowingly falsified or concealed a material fact, or knowingly made a false statement or representation, about the eligibility of the vessel under [the citizenship requirement]," *id.* § 12151(c) (emphasis added).

Determining whether a penalty is self-executing and mandatory under the FCA requires examining the statutory language and the broader context of the statute as a whole. *See Miller*, 110 F.4th at 546. "Liable" is defined, in relevant part, as "[r]esponsible or answerable in law; legally obligated," or "[s]ubject to or likely to incur a fine, penalty, etc." *Liable*, BLACK'S LAW

24

DICTIONARY (12th ed. 2024). Relators assert that this ends the matter. However, it does not suffice to say that "is liable" means "obligation"—this tautology provides no insight. The question is whether "is liable" under the AFA constitutes an "established duty," which, for purposes of the FCA, means an "immediate and *self-executing* duty to pay." *Miller*, 110 F.4th at 545 (emphasis added). We conclude that it does not.

First, the statute does not on its face establish a self-executing obligation. The only other statutory provision concerning penalties in the AFA provides that, "[i]f the owner of a vessel fails to pay a civil penalty *imposed* by the Secretary [of Transportation], the Secretary may . . . deny . . . or revoke" the issuance of a fishery endorsement for the vessel in question. 46 U.S.C. § 12152 (emphasis added). That the Secretary of Transportation *imposes* a civil penalty suggests that the Secretary and/or MARAD must take affirmative steps to communicate, confirm, and collect the penalties, indicating that they are neither self-executing nor immediate.

Second, the statutory context indicates that the penalties are discretionary, not mandatory. For example, the AFA provides that MARAD "may conduct investigations and inspections regarding compliance." *Id.* § 12140(a). Moreover, the relevant MARAD regulation notes that certain penalties "may apply" if an entity violates the citizenship requirement. *See* 46 C.F.R. § 356.49.

We have previously noted that "[t]he repeated use of the term 'may' implies discretion" and undercuts the argument that the available penalties are mandatory. *See Miller*, 110 F.4th at 547 (citing *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310) (2020). Indeed, as the district court noted, the allegations of the amended complaint confirm the discretionary nature of the potential penalties under the AFA. *See* App'x at 97 ("The National Vessel Documentation Center ('NVDC'), a unit within the Coast

25

Guard, is one of the federal bodies that investigates vessel citizenship requirement violations and *recommends* appropriate penalties. . . . In February 2012, the Coast Guard approved commencement of a civil penalty assessment process against Trico to collect penalties under 46 U.S.C. § 12151(a). MARAD concurred in the Coast Guard's findings of fact.") (emphasis added).

In short, it is abundantly clear from the statutory framework that the civil penalty for violating the AFA is not self-executing, and it is in the discretion of MARAD as to whether to impose a civil penalty for any violations of the AFA and, thus, this unassessed civil penalty cannot constitute an "obligation to pay" for purposes of a reverse false claim under the FCA. *See also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 196 F. Supp. 3d 436, 447 (D. Del. 2016) ("[L]iability under [Section 12151 of the AFA] is contingent on the government's discretion to impose fines on defendants, as evidenced by the statutory language. As such, these potential obligations to pay unassessed fines are not within the scope of the FCA.").

Our holding is consistent with our recent decision in *Miller*, in which we held that a relator failed to sufficiently allege a reverse false claim based on civil penalties allegedly avoided by the defendant. More specifically, the relator argued that "she sufficiently alleged that [the defendant] had an obligation, or established duty, to pay because [the defendant's] conduct violated the 2015 Consent Orders, triggering 'mandatory payment provisions' or 'immediate liability' under the FDIA [(Federal Deposit Insurance Act)]." 110 F.4th at 546. The statute at issue provided that a bank that violates a final order "shall forfeit and pay a civil penalty." 12 U.S.C. § 1818(i)(2)(A)–(C). Notwithstanding the "shall" language, we rejected the relator's argument that the potential fine for violation of the FDIA constituted an "obligation to pay" under the FCA. *Miller*, 110 F. 4th at 544–47. In doing so, we

explained that we agree with "our sister circuits [who] have concluded that potential or contingent exposure to penalties does not create an 'established' duty to pay and, accordingly, an obligation does not exist by the mere fact of a violation." *Id.* at 545 & n.5 (collecting cases); *see, e.g., United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725 (D.C. Cir. 2019) ("[A]n unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim.") (alteration in original); *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039 (5th Cir. 2016) (holding, in the context of a reverse false claim, that "[w]here . . . a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay"). We then determined that, "[w]hile the FDIA's 'shall forfeit and pay' language, by itself, could arguably be read to require immediate and mandatory penalties, . . . the statutory context makes clear that these penalties are not mandatory, but discretionary." *Miller*, 110 F.4th at 546. In other words, "the [relevant agency] has the discretion *not* to impose a penalty that the FDIA states a bank 'shall forfeit and pay'" and, "accordingly, [that language] do[es] not trigger mandatory payment provisions or immediate liability under the FDIA." *Id.* at 547 (emphasis in original) (internal quotation marks and citation omitted).

Here, as in *Miller*, Relators put the cart before the horse, as any obligation by Defendants to pay a penalty for any violations of the AFA has not yet materialized. The Secretary of Transportation retains the discretion to determine whether to impose a civil penalty for any violation, and "an obligation does not exist by the mere fact of a violation." *Id.* at 545; *see also Simoneaux*, 843 F.3d at 1040 (emphasizing that "most regulatory statutes . . . impose only a duty to obey the law, and the duty to *pay* regulatory penalties

27

is not 'established' until the penalties are assessed") (emphasis in original).

Relators' arguments to the contrary are unavailing. They suggest that the question of whether penalties are mandatory or discretionary can be answered only by reference to the relevant statute and that related regulations are of no moment. However, that takes our holding in *Miller* too far; nowhere did we suggest that related regulations are irrelevant to determining whether penalties are mandatory or discretionary. Rather, courts may consider related regulations in the course of exercising their independent judgment in interpreting a statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). In any event, our determination would be the same based upon the statutory language, even without consideration of the regulations.

Relators' reference to *United States v. Monsanto*, 491 U.S. 600 (1989), also misses the mark. In *Monsanto*, the Supreme Court held that a statute providing that a person convicted of certain offenses "shall forfeit . . . any property" and that the sentencing court "shall order" forfeiture clearly set forth mandatory penalties. *Id.* at 607. The Supreme Court noted that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied." *Id.* The discretionary language in the AFA is a far cry from the strong verbiage in the statute at issue in *Monsanto*. And regardless of whether the penalties under the AFA are mandatory, no self-executing obligation to pay those penalties arises automatically upon committing a violation.

Accordingly, because the potential civil penalties for violations under the AFA do not constitute an "obligation to pay" under the FCA, 31 U.S.C. § 3729(a)(1)(G), the district court correctly held that Relators had failed to state a reverse false claim.

## III.    Leave to Amend

Finally, Relators challenge the district court's denial of their request to further amend their complaint.

"We generally review a district court's decision to permit or deny leave to amend a complaint for abuse of discretion, keeping in mind that leave to amend should be freely granted when justice so requires." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015) (internal quotation marks and citation omitted). "However, when denial of leave to file a revised pleading is based on a legal interpretation, such as futility, a reviewing court conducts a *de novo* review." *Id.* A request to amend is futile if "proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017) (internal quotation marks and citation omitted).

In their opposition to Defendants' motions to dismiss, Relators requested leave to amend to add a conversion claim under 31 U.S.C. § 3729(a)(1)(D), in light of our decision in *Miller*. Section 3729(a)(1)(D) imposes liability on any person who "has possession, custody, or control of property or money used, or to be used, by the [g]overnment and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). The statute does not define "use." *See id.* § 3729(b). Relators sought to add this new conversion claim under Section 3729(a)(1)(D) based upon the theory that Defendants failed to deliver unlawfully harvested fish to the government, and Relators relied upon *United States v. Bengis*, 631 F.3d 33, 38–40 (2d Cir. 2011), which they contend supports the proposition that "illegally caught fish are immediately treated as government property the moment they are caught because they are subject to seizure and sale by the government." Appellants' Br. at 51.

29

The district court denied Relators' request, finding that they did "not explain how or why the Second Circuit's decision in *Miller*—which construed only the FCA's reverse false claims provision—suggests that they should be permitted to bring a new claim under an entirely different provision." *Cooke*, 2025 WL 27662, at *9. The district court further noted that it had already granted Relators leave to amend in response to Defendants' initial motions to dismiss and warned that there would be no further opportunities to amend. *Id.*

We conclude that the district court did not abuse its discretion in denying Relators' request for leave to amend because of the undue delay in asserting it.[8] Although Relators suggest this Court's decision in *Miller* effected a change in the law that required the district court to grant leave to amend, we disagree. *Miller* makes no mention whatsoever of Section 3729(a)(1)(D), and we agree with the district court that Relators failed to adequately explain below why *Miller* should permit them "to bring a new claim under an entirely different provision." *Id.* On appeal, Relators now explain that, prior to *Miller*, they "believed in good faith that the *Bengis* doctrine would state a claim under [Section] 3729(a)(1)(G)," *i.e.*, a reverse false claim, but that *Miller*'s clarification of "the meaning of 'established'" as it relates to reverse false claims has led Plaintiffs to believe "that a claim under *Bengis* would be a better fit under [Section] 3729(a)(1)(D)."[9] Appellants'

---

[8]  The district court alternatively denied Relators' request for leave to amend based on the futility of their proposed amendment. *Cooke*, 2025 WL 27662, at *9. However, because we affirm on the other grounds articulated by the district court, we do not reach whether the proposed amendment was futile.

[9]  *Bengis* concerned whether crimes of conspiring to commit smuggling under 18 U.S.C. § 371 and violations of the Lacey Act, 16 U.S.C.

30

Br. at 57. Thus, Relators assert that, "[a]lthough *Miller* might still permit such a claim [under Section 3729(a)(1)(G)], the *Bengis* doctrine now fits more naturally under [Section] 3729(a)(1)(D)." *Id.* at 57–58 n.10.

To be sure, our 2024 decision in *Miller* substantially undermined any argument regarding a plausible reverse false claim in the amended complaint under Section 3729(a)(1)(G), for the reasons discussed *supra*. However, any potential conversion claim under Section 3729(a)(1)(D) based on *Bengis*, which was decided in 2011, existed long before this litigation was commenced and was unaffected by our decision in *Miller*. In other words, Relators were free, when drafting the original complaint and the amended complaint, to also assert the Section 3729(a)(1)(D) claim that they now seek to add but chose to omit from their first two complaints. In short, the district court was not required to provide Relators with another opportunity to amend when they could have brought this separate claim earlier and raised it only after the district court had stated that no further amendments would be allowed. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 258 (2d Cir. 2018) ("[A] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (internal quotation marks and citation omitted).

Accordingly, it was not an abuse of discretion to deny the request to further amend the complaint given the undue delay in raising the new claim. *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 55 (2d Cir. 2025); *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).

---

§ 3372(a)(2)(A), were "offenses against property." We held that South Africa had a property interest in illegally harvested lobsters because the illegal harvesting "deprived South Africa of proceeds from the sale of the illegally harvested lobsters." *Bengis*, 631 F.3d at 40.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.